# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| RAFAT KISHTAH, Individually and On Behalf of All Others Similarly Situated, | )<br>)<br>) |
| Plaintiff, | )<br>**CIVIL ACTION NO.**<br>) |
| vs. | )<br>) |
| HCA HOLDINGS, INC., RICHARD M. BRACKEN, R. MILTON JOHNSON, CHRISTOPHER J. BIROSAK, JOHN P. CONNAUGHTON, JAMES D. FORBES, KENNETH W. FREEMAN, THOMAS F. FRIST, III, WILLIAM R. FRIST, CHRISTOPHER R. GORDON, MICHAEL W. MICHELSON, JAMES C. MOMTAZEE, STEPHEN G. PAGLIUCA, NATHAN C. THORNE, BANK OF AMERICA MERRILL LYNCH, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES INC., GOLDMAN, SACHS & CO., MORGAN STANLEY & CO. INCORPORATED, WELLS FARGO SECURITIES, LLC, CREDIT AGRICOLE SECURITIES (USA) INC., MIZUHO SECURITIES USA INC., RBC CAPITAL MARKETS, LLC, RBS SECURITIES INC., SMBC NIKKO CAPITAL MARKETS LIMITED, SUNTRUST ROBINSON HUMPHREY, INC., AVONDALE PARTNERS, LLC, ROBERT W. BAIRD & CO. INCORPORATED, COWEN AND COMPANY, LLC, CRT CAPITAL GROUP LLC, LAZARD CAPITAL MARKETS LLC, LEERINK SWANN LLC, MORGAN KEEGAN & COMPANY, INC., OPPENHEIMER & CO. INC., RAYMOND JAMES & ASSOCIATES, INC., SUSQUEHANNA FINANCIAL GROUP LLLP, SAMUEL A. RAMIREZ & COMPANY INC., THE WILLIAMS CAPITAL GROUP, L.P., MURIEL SIEBERT & CO., INC., LOOP CAPITAL MARKETS, L.L.C., GLEACHER & COMPANY SECURITIES, INC., CASTLEOAK | )<br>**CLASS ACTION COMPLAINT**<br>)<br>)<br>)<br>**JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiff, Rafat Kishtah ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding HCA Holdings, Inc. ("HCA" or the "Company") and securities analysts' reports and advisories about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of the common stock of HCA, who purchased or otherwise acquired HCA common stock pursuant or traceable to the Company's March 9, 2011 Initial Public Offering (the "IPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      HCA is the largest non-governmental hospital operator in the U.S. and a leading comprehensive, integrated provider of health care and related services.  The Company provides these services through a network of acute care hospitals, outpatient facilities, clinics and other patient care delivery settings.  As of December 31, 2010, HCA operated 164 hospitals and 106 freestanding surgery centers across 20 states throughout the U.S. and in England.

3.      On or about March 9, 2011 the Company conducted its IPO.  In connection with the IPO, the defendants issued a Registration Statement and a Prospectus (which forms part of the Registration Statement).  Collectively, these documents are referred to as the "Offering

Materials." The IPO was a financial success for the Company and its underwriters, as they raised $4.3539 billion by selling over 145 million shares of the Company's common stock to investors at a price of $30.00 per share.

4.      Four months later, the Company shocked investors when it announced disappointing financial results for the second quarter of 2011. For the quarter, HCA reported revenue of $8.063 billion and net income of $229 million, or $0.43 per diluted share. HCA stated that its lower than anticipated revenue growth and earnings was the result of a shift in service mix from more complex surgical cases to less acute medical cases.

5.      Upon the release of this news, shares of the Company's stock declined $6.64 per share, or over 19 percent, to close on July 25, 2011 at $27.97 per share, on unusually heavy trading volume.

6.      Then, on October 1, 2011, *Barron's* published an article that called into question the Company's accounting practices going as far back as 2006. In particular, the article focused on two transactions: one in November 2006 and another in November 2010. According to the article, HCA should have accounted for each of these transactions as an acquisition using the purchase accounting method set forth in Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*. However, instead of using this method, HCA used the equivalent of a pooling-of-interests method, even though such a method was eliminated by the Financial Accounting Standards Board in 2001 (as a way to improve the quality of information provided to investors and users of financial statements). HCA thus overstated its reported earnings by avoiding significant charges, including substantial depreciation and amortization charges. The article illustrated how, had HCA correctly taken such charges, its 2010 pretax earnings would have been "slashed" by $790 million, from $2.2 billion to $1.44 billion—a 35%

reduction. Similarly, had HCA correctly taken such charges in 2011, "instead of the $984 million of pretax earnings that HCA Holdings reported for 2011's first six months, the pro forma total would have been $369 million ($984 million minus $615 million—half of $1.23 billion), a whopping 60% less than the reported figure." Upon the release of this news, shares of the Company's stock fell $1.35 per share, or over 6 percent, to close on October 3, 2011 at $18.81 per share, on unusually heavy trading volume. This closing price on October 3, 2011 represented a cumulative loss of $11.19 per share, or over 37 percent of the value of the Company's shares at the time of its IPO just months prior.

7. The Complaint alleges that the Offering Materials contained material misstatements and omissions. Specifically, the defendants failed to disclose or indicate the following: (1) that HCA had improperly accounted for prior business combinations; (2) that as a result, HCA's historical financial results were misstated; (3) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (4) that the Company would not be able to maintain its revenue growth rate, since past results distorted and were not indicative of present and future operations; (5) that the Company lacked adequate internal and financial controls; and (6) that, as a result of the foregoing, the Company's Offering Materials were materially misleading when issued.

8. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class Members suffered damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

11.     Venue is proper in this District pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, HCA maintains its principal executive offices in this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, Rafat Kishtah as set forth in the accompanying certification, incorporated by reference herein, purchased HCA common stock pursuant or traceable to the IPO at artificially inflated prices and has been damaged thereby.

14.     Defendant HCA is a Tennessee corporation with its principal executive offices located at One Park Plaza, Nashville, Tennessee.

15.     Defendant Richard M. Bracken ("Bracken") was, at relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors. Bracken signed the false and misleading Registration Statement.

5

16. Defendant R. Milton Johnson ("Johnson") was, at relevant times, the Company's President and Chief Financial Officer ("CFO"), as well as a member of the Company's Board of Directors. Johnson signed the false and misleading Registration Statement.

17. Defendant Christopher J. Birosak ("Birosak") was, at relevant times, a member of the Company's Board of Directors. Birosak signed the false and misleading Registration Statement.

18. Defendant John P. Connaughton ("Connaughton") was, at relevant times, a member of the Company's Board of Directors. Connaughton signed the false and misleading Registration Statement.

19. Defendant James D. Forbes ("Forbes") was, at relevant times, a member of the Company's Board of Directors. Forbes signed the false and misleading Registration Statement.

20. Defendant Kenneth W. Freeman ("Freeman") was, at relevant times, a member of the Company's Board of Directors. Freeman signed the false and misleading Registration Statement.

21. Defendant Thomas F. Frist, III ("T. Frist") was, at relevant times, a member of the Company's Board of Directors. T. Frist signed the false and misleading Registration Statement.

22. Defendant William R. Frist ("W. Frist") was, at relevant times, a member of the Company's Board of Directors. W. Frist signed the false and misleading Registration Statement.

23. Defendant Christopher R. Gordon ("Gordon") was, at relevant times, a member of the Company's Board of Directors. Gordon signed the false and misleading Registration Statement.

24.     Defendant Michael W. Michelson ("Michelson") was, at relevant times, a member of the Company's Board of Directors. Michelson signed the false and misleading Registration Statement.

25.     Defendant James C. Momtazee ("Momtazee") was, at relevant times, a member of the Company's Board of Directors. Momtazee signed the false and misleading Registration Statement.

26.     Defendant Stephen G. Pagliuca ("Pagliuca") was, at relevant times, a member of the Company's Board of Directors. Pagliuca signed the false and misleading Registration Statement.

27.     Defendant Nathan C. Thorne ("Thorne") was, at relevant times, a member of the Company's Board of Directors. Thorne signed the false and misleading Registration Statement.

28.     Defendants Bracken, Johnson, Birosak, Connaughton, Forbes, Freeman, T. Frist, W. Frist, Gordon, Michelson, Momtazee, Pagliuca and Thorne are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of HCA's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants

are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

29.    Defendant Bank of America Merrill Lynch ("BofA") was an underwriter of the Company's IPO.

30.    Defendant Citigroup Global Markets, Inc. ("Citigroup") was an underwriter of the Company's IPO.

31.    Defendant J.P. Morgan Securities LLC ("JP Morgan") was an underwriter of the Company's IPO.

32.    Defendant Barclays Capital Inc. ("Barclays") was an underwriter of the Company's IPO.

33.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's IPO.

34.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Company's IPO.

35.    Defendant Goldman, Sachs & Co. ("Goldman") was an underwriter of the Company's IPO.

36.    Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") was an underwriter of the Company's IPO.

37.    Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the Company's IPO.

38.    Defendant Credit Agricole Securities USA Inc. ("Credit Agricole") was an underwriter of the Company's IPO.

39. Defendant Mizuho Securities USA Inc. ("Mizuho") was an underwriter of the Company's IPO.

40. Defendant RBC Capital Markets, LLC ("RBC") was an underwriter of the Company's IPO.

41. Defendant RBS Securities Inc. ("RBS") was an underwriter of the Company's IPO.

42. Defendant SMBC Nikko Capital Markets Limited ("SMBC") was an underwriter of the Company's IPO.

43. Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") was an underwriter of the Company's IPO.

44. Defendant Avondale Partners, LLC ("Avondale") was an underwriter of the Company's IPO.

45. Defendant Robert W. Baird & Co. Incorporated ("Baird") was an underwriter of the Company's IPO.

46. Defendant Cowen and Company, LLC ("Cowen") was an underwriter of the Company's IPO.

47. Defendant CRT Capital Group, LLC ("CRT") was an underwriter of the Company's IPO.

48. Defendant Lazard Capital Markets, LLC ("Lazard") was an underwriter of the Company's IPO.

49. Defendant Leerink Swann LLC ("Leerink") was an underwriter of the Company's IPO.

50. Defendant Morgan Keegan & Company, Inc. ("Morgan Keegan") was an underwriter of the Company's IPO.

51. Defendant Oppenheimer & Co. Inc. ("Oppenheimer") was an underwriter of the Company's IPO.

52. Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter of the Company's IPO.

53. Defendant Susquehanna Financial Group, LLLP ("Susquehanna") was an underwriter of the Company's IPO.

54. Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez") was an underwriter of the Company's IPO.

55. Defendant The Williams Capital Group, L.P. ("Williams") was an underwriter of the Company's IPO.

56. Defendant Muriel Siebert & Co., Inc. ("Muriel Siebert") was an underwriter of the Company's IPO.

57. Defendant Loop Capital Markets L.L.C. ("Loop Capital") was an underwriter of the Company's IPO.

58. Defendant Gleacher & Company Securities, Inc. ("Gleacher") was an underwriter of the Company's IPO.

59. Defendant CastleOak Securities, L.P. ("CastleOak") was an underwriter of the Company's IPO.

60. Defendant Sanford C. Bernstein & Co., LLC ("Sanford Bernstein") was an underwriter of the Company's IPO.

61.     Defendant Caris & Company Inc. ("Caris") was an underwriter of the Company's IPO.

62.     Defendants BofA, Citigroup, JP Morgan, Barclays, Credit Suisse, Deutsche Bank, Goldman, Morgan Stanley, Wells Fargo, Credit Agricole, Mizuho, RBC, RBS, SMBC, SunTrust, Avondale, Baird, Cowen, CRT, Lazard, Leerink, Morgan Keegan, Oppenheimer, Raymond James, Susquehanna, Ramirez, Williams, Muriel Siebert, Loop Capital, Gleacher, CastleOak, Sanford Bernstein and Caris are collectively referred to hereinafter as the "Underwriter Defendants." The Underwriter Defendants served as financial advisors, and assisted in the preparation and dissemination of the Offering Materials for HCA's IPO.

63.     Defendant Ernst & Young LLP ("E&Y" or the "Auditor Defendant") served as the Company's Registered Public Accounting Firm. E&Y audited HCA's financial statements, and issued unqualified opinions about the effectiveness of the Company's internal control over financial reporting which were included in the Offering Materials.

## SUBSTANTIVE ALLEGATIONS

### Background

64.     HCA is the largest non-governmental hospital operator in the U.S. and a leading comprehensive, integrated provider of health care and related services. The Company provides these services through a network of acute care hospitals, outpatient facilities, clinics and other patient care delivery settings. As of December 31, 2010, HCA operated 164 hospitals and 106 freestanding surgery centers across 20 states throughout the U.S. and in England.

65.     On or about March 9, 2011 the Company conducted its IPO. In connection with the IPO, the Company filed the Offering Materials with the SEC. The IPO was a financial

success for the Company and its underwriters, as they raised $4.359 billion by selling over 145 million shares of stock to investors at a price of $30.00 per share.

66.     More specifically, on March 9, 2011, HCA filed with the SEC a Form S-1/A Registration Statement.  Two days later, on March 11, 2011, HCA filed the Prospectus (which forms part of the Registration Statement) and which became effective on March 9, 2011.

**Materially False and Misleading**
**Statements Made in the Offering Materials**

67.     For the year ended December 31, 2010, the Offering Materials reported net income of $1.573 billion, or $2.76 per diluted share.  For the year ended December 31, 2009, the Offering Materials reported net income of $1.375 billion, or $2.44 per diluted share.  For the year ended December 31, 2008, the Offering Materials reported net income of $902 million, or $1.56 per diluted share.

68.     The Offering Materials also reported income before income taxes (or pretax income) of $2.231 billion for the year ended December 31, 2010, $2.002 billion for the year ended December 31, 2009, and $1.170 billion for the year ended December 31, 2008.

69.     Regarding the Company's corporate strategy, the Offering Materials stated:

Our patient-first strategy is to provide high quality health care services in a cost-efficient manner. We intend to build upon our history of profitable growth by maintaining our dedication to quality care, increasing our presence in key markets through organic expansion and strategic acquisitions and joint ventures, leveraging our scale and infrastructure, and further developing our physician and employee relationships. We believe pursuing these core elements of our strategy helps us develop a faster-growing, more stable and more profitable business and increases our relevance to patients, physicians, payers and employers.

70.     Additionally, with respect to the Company's purported "competitive strengths," the Offering Materials stated:

*Leading Local Market Positions in Large, Growing, Urban Markets.* Over our history, we have sought to selectively expand and upgrade our asset base to create

a premium portfolio of assets in attractive growing markets. As a result, we have a strong market presence in 14 of the top 25 fastest growing markets with populations greater than 500,000 in the U.S. We currently operate in 29 markets, 17 of which have populations of 1 million or more, with all but one of these markets projecting growth above the national average from 2009 to 2014. Our inpatient market share places us first or second in many of our key markets. We believe the strength and stability of these market positions will create organic growth opportunities and allow us to develop long-term relationships with patients, physicians, large employers and third-party payers.

*Diversified Revenue Base and Payer Mix.* We believe our broad geographic footprint, varied service lines and diverse revenue base mitigate our risks in numerous ways. Our diversification limits our exposure to competitive dynamics and economic conditions in any single local market, reimbursement changes in specific service lines and disruptions with respect to payers such as state Medicaid programs or large commercial insurers. We have a diverse portfolio of assets with no single facility contributing more than 2.3% of our revenues and no single metropolitan statistical area contributing more than 8.0% of revenues for the year ended December 31, 2010. We have also developed a highly diversified payer base, including approximately 3,000 managed care contracts, with no single commercial payer representing more than 8% of revenues for the year ended December 31, 2010. In addition, we are one of the country's largest providers of outpatient services, which accounted for approximately 38% of our revenues for the year ended December 31, 2010. We believe the geographic diversity of our markets and the scope of our inpatient and outpatient operations help reduce volatility in our operating results.

*     *     *

*Strong Operating Results and Cash Flows.* Our leading scale, diversification, favorable market positions, dedication to clinical quality and focus on operational efficiency have enabled us to achieve attractive historical financial performance even during the most recent economic period. In the year ended December 31, 2010, we generated net income attributable to HCA Holdings, Inc. of $1.207 billion, Adjusted EBITDA of $5.868 billion and cash flows from operating activities of $3.085 billion. Our ability to generate strong and consistent cash flow from operations has enabled us to invest in our operations, reduce our debt, enhance earnings per share and continue to pursue attractive growth opportunities.

71.    Further, and with respect to the Company's "growth strategy," the Offering Materials stated:

We are committed to providing the communities we serve with high quality, cost-effective health care while growing our business, increasing our profitability and creating long-term value for our stockholders.

72.     Additionally, with regard to internal control over financial reporting, the Offering Materials stated:

> Our management is responsible for establishing and maintaining effective internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective, can provide only reasonable assurance with respect to financial statement preparation and presentation.
>
> Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an assessment of the effectiveness of our internal control over financial reporting based on the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our assessment under the framework in Internal Control — Integrated Framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2010.

73.     The Offering Materials also contained a report signed by Defendant E&Y, who stated, with respect to the Company's internal control over financial reporting:

> We have audited HCA Holdings, Inc.'s internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). HCA Holdings, Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*In our opinion, HCA Holdings, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2010,* based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of HCA Holdings, Inc. as of December 31, 2010 and 2009, and the related consolidated statements of income, stockholders' deficit, and cash flows for each of the three years in the period ended December 31, 2010 and our report dated February 17, 2011 *expressed an unqualified opinion thereon*. [Emphasis added.]

74.     Defendant E&Y also signed a report contained within the Offering Materials that stated, with respect to the accuracy of the Company's financial statements:

*We have audited the accompanying consolidated balance sheets of HCA Holdings, Inc. as of December 31, 2010 and 2009, and the related consolidated statements of income, stockholders' deficit, and cash flows for each of the three years in the period ended December 31, 2010.* These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the

financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the financial statements referred to above, present fairly, in all material respects, the consolidated financial position of HCA Holdings, Inc. at December 31, 2010 and 2009, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2010, in conformity with U.S. generally accepted accounting principles.***

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), HC Holdings, Inc.'s internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 17, 2011 expressed an unqualified opinion thereon. [Emphasis added.]

75.     At the time the Offering Materials were issued, the defendants failed to disclose or indicate the following:  (1) that HCA had improperly accounted for prior business combinations; (2) that as a result, HCA's historical financial results were misstated; (3) that the Company's financial statements were not prepared in accordance with GAAP; (4) that the Company would not be able to maintain its revenue growth rate, since past results distorted and were not indicative of present and future operations; (5) that the Company lacked adequate internal and financial controls; and (6) that, as a result of the foregoing, the Company's Offering Materials were materially misleading when issued.

### The Truth Begins to Emerge

76.     On July 25, 2011, the Company issued a press release entitled "HCA Reports Second Quarter 2011 Results."  Therein, the Company, in relevant part, revealed:

- Revenues increased 4 percent to $8.063 billion; cash revenues increased 4.6 percent to $7.288 billion

- Net income attributable to HCA Holdings, Inc. totaled $229 million, or $0.43 per diluted share, which includes a pre-tax loss on retirement of debt of $75 million, or $0.08 per diluted share
- Adjusted EBITDA declined 4.7 percent to $1.420 billion

\* \* \*

"While the Company had favorable admissions growth during the quarter, *we experienced a shift in service mix from more complex surgical cases to less acute medical cases. This resulted in lower than anticipated revenue growth and earnings,"* said Richard M. Bracken, Chairman of the Board and Chief Executive Officer of HCA.

\* \* \*

Net income attributable to HCA Holdings, Inc. totaled $229 million, or $0.43 per diluted share, compared to $293 million, or $0.67 per diluted share, in the second quarter of 2010. Results for the second quarter of 2011 include a loss on retirement of debt of $75 million, or $0.08 per diluted share. Results for the second quarter of 2010 include impairments of long-lived assets of $91 million, or $0.13 per diluted share. . . . The increase was due to the initial public offering of 87.7 million shares of our common stock in March of 2011. Adjusted EBITDA declined to $1.420 billion compared to $1.490 billion in the prior year period. Adjusted EBITDA is a non-GAAP financial measure.

\* \* \*

Revenues for the six months ended June 30, 2011 totaled $16.118 billion compared to $15.300 billion in the same period of 2010. Net income attributable to HCA Holdings, Inc. was $469 million, or $0.94 per diluted share, compared to $681 million, or $1.56 per diluted share, for the first six months of 2010. Results for the six months ended June 30, 2011 include a loss on retirement of debt of $75 million, or $0.09 per diluted share, and a charge for the termination of a management agreement of $181 million, or $0.30 per diluted share. Results for the six months ended June 30, 2010 include impairments of long-lived assets of $109 million, or $0.16 per diluted share. Adjusted EBITDA for the six months ended June 30, 2011 totaled $3.010 billion compared to $3.064 billion in the prior year period. [Emphasis added.]

77.     Upon the release of this news, shares of the Company's stock declined $6.64 per share, or over 19 percent, to close on July 25, 2011 at $27.97 per share, on unusually heavy trading volume.

78.     Then on October 1, 2011, *Barron's* published an article entitled "Where Did the $15.8 Billion Go?"  This article, in relevant part, revealed:

HCA Holdings, which once upon a time was called Hospital Corp. of America, runs the nation's largest chain of private hospitals and freestanding surgery centers and provides outpatient and ancillary services in 20 states and England.

17

For most of its history, it was publicly traded. Then, in November 2006, it went private via Hercules Holding II LLC, an entity controlled by private-equity firms and Thomas F. Frist Jr., of HCA's founding family.

After a reorganization and a new name, the company returned to the ranks of the publicly owned in March of this year, when it sold 88 million shares (ticker: HCA) at $30 a pop. They enjoyed a quick run-up to 35 and change, only to be hammered down on disappointing earnings, fears of government spending cuts and the general market malaise.

The stock hovered in the teens until a couple of weeks ago, when it rose to around 20 on the disclosure that HCA had agreed to buy back Bank of America's 15.6% stake—some 80.8 million shares—for $1.5 billion, or $18.61 apiece. To raise the necessary funds, management said that it would use cash on hand and borrow from available credit facilities. It added that it will retire the repurchased stock.

EVEN WITH THE BOOST furnished by that announcement and the prospective shrinkage of its total of outstanding shares, ***HCA's stock remains roughly a third cheaper than what it fetched in the initial public offering a scant six months ago.*** To be sure, it wasn't the only IPO badly bruised in the violent swings that have characterized equity action these past few months. ***Perhaps more noteworthy than the stock's ups and downs, though, are some of HCA's bookkeeping practices. Of particular note is its use of the equivalent of pooling-of-interest accounting, which the Financial Accounting Standards Board put the kibosh on in 2001.***

Pooling allowed the assets and liabilities of the acquired and acquiring companies to simply be added together. Any premium paid above the book value of the acquired company wasn't reflected in the acquirer's balance sheet and thus didn't need to be later amortized and expensed. ***In contrast, under the purchase method of accounting, which FASB favors, the premium does go on the acquirer's balance sheet, as an increase to the values of acquired assets, with the remainder classified as "goodwill."*** The increased values of assets like buildings and contracts are depreciated or amortized over subsequent periods, with goodwill assessed yearly for impaired value. The resulting expenses reduce reported earnings.

In essence, using pooling-of-interests accounting enables Company A to acquire the shares of Company B for $1 billion and account for the acquisition as though the cost were only $1 million, if that was Company B's book value. And what, you may well ask, happened to the remaining $999 million? Well, it simply evaporates. ***In June 2001, FASB rejected this practice in its solemnly entitled Statement of Financial Accounting Standards No. 141, "Business Combinations." It effectively mandated that every single dollar of that $1 billion was to be accounted for on the acquiring company's books. Six years later, FASB strengthened 141 by issuing SFAS 141R "to improve the relevance,***

*representational faithfulness and comparability of the information that a reporting entity provides in its financial reports about a business combination and its effects." In other words, the rule says that acquirers should be held accountable for the investment performance of their acquisitions.*

*HCA SAYS ITS ACCOUNTING TREATMENT is proper. "The 2006 and 2010 transactions in question were thoroughly reviewed by the company and its independent auditors,"* said HCA's chief accounting officer, Don Street, in a written response to our questions. "The company concluded, and its auditors concurred, that the transactions were appropriately accounted for in compliance with Generally Accepted Accounting Principles."

*Crucial to evaluating HCA Holdings' accounting are two dates: November 2006 and November 2010.*

In November 2006, private-equity funds run by Bain Capital, Kohlberg Kravis Roberts and Merrill Lynch took HCA private through an entity called Hercules Holding II, which bought the hospital chain for $20.9 billion, or $51 a share. *According to the hospital chain's 2006 financial statements and subsequent filings, they treated the acquisition as a recapitalization "with no adjustments to the historical basis to our assets and liabilities." Those words effectively mean that Hercules' accounting treated the combination as though it were a pooling of interests.*

While Hercules paid $20.9 billion for the hospital company's stock, HCA Holdings' financial statements account for the acquisition as if it had cost only $5.1 billion–the value of shareholders' equity on the hospital company's books in September 2006. *The missing $15.8 billion evaporated into a murky category that can be called unallocated costs.*

If that $15.8 billion had been added to the carrying values of HCA's hospitals–and they were clearly worth that much more to the private-equity folks–amounts other than goodwill might have been amortized over a score of years, adding as much as $790 million in expense for each year that the hospitals were under the Hercules aegis. *As a result, for example, pretax earnings in 2010 of the hospital chain—or its private-equity owners—would have been slashed by $790 million* (in our pro forma scenario), from $2.23 billion to $1.44 billion, a 35%-plus reduction!

*On the second critical date of Nov. 22, 2010, KKR et al. reorganized the ownership of the hospitals, with HCA Holdings acquiring the business in exchange for shares that the later public offering would value at $30 each, or $12.8 billion. Since the net book value shown for the business at year-end 2010 was a negative $11.8 billion, the unallocated cost on the reorganization came to a hefty $24.6 billion. If that had been spread over a score of years, $1.23 billion*

*would be subtracted each year, sharply reducing pro forma earnings in the process.*

*What that would mean is that instead of the $984 million of pretax earnings that HCA Holdings reported for 2011's first six months, the pro forma total would have been $369 million ($984 million minus $615 million—half of $1.23 billion), a whopping 60% less than the reported figure.*

HCA says that such an earnings hit wouldn't have resulted, even if the basis of the acquired assets had been "grossed up" for the acquisition premium. "Even if GAAP had provided for purchase accounting treatment for either the 2006 or 2010 transaction," said HCA accounting chief Street, "we believe the majority of any asset basis adjustments would have been to goodwill and land, assets not subject to amortization or depreciation."

"The transactions and the accounting treatment have been consistently disclosed in our SEC filings and subject to SEC review," said Street, "and have been available to and discussed with analysts and the investment community."

Worth repeating is that, prior to the takeover by KKR et al., HCA's balance sheet had shown shareholders' equity of $5.1 billion, but at year end 2010, it was a negative $11.8 billion. That striking deterioration of almost $17 billion was a consequence of net shareholder distributions of $16.4 billion in 2006 and $4.3 billion in 2010 to the private owners in advance of the company's IPO. The severe plunge in shareholders' equity was accompanied by a surge of $17.1 billion in long-term indebtedness, from $10.5 billion to $27.6 billion from September 2006 to December 2010.

Simply put, after HCA was taken private, it was loaded with debt used to hand out billions of dollars to insiders. Then HCA was sold to public shareholders, whose investment's performance will be weighed down by that huge indebtedness for years.

*It's only fair to mention that Ernst & Young was HCA's independent auditor. The firm didn't respond to our inquiries, but it has blessed the accounting of the enterprise in its various incarnations. As perhaps you've inferred, we strongly disagree.* [Emphasis added.]

79. On this news, shares of the Company's stock fell $1.35 per share, or over 6 percent, to close on October 3, 2011 at $18.81 per share, on unusually heavy trading volume. This closing price on October 3, 2011 represented a cumulative loss of $11.19, or over 37 percent, of the value of the Company's shares at the time of its IPO just months prior.

20

# HCA'S VIOLATION OF GAAP RULES
## IN ITS FINANCIAL STATEMENTS
## <u>FILED WITH THE SEC</u>

80.     These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

81.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

82.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

> (a)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

> (b)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and

Case 3:11-cv-01098   Document 1   Filed 11/16/11   Page 21 of 27 PageID #: 21

effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(c)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(d)     The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(f)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(g)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

83.     The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all those who purchased or otherwise acquired HCA's common stock pursuant or traceable to the Company's March 9, 2011 IPO, and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

85.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  In connection with the Company's IPO, the defendants sold over 145 million shares of HCA stock to the public.  These shares are owned by thousands of persons.

86.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      (a)     Whether the Securities Act was violated by defendants;

      (b)     Whether defendants omitted and/or misrepresented material facts in the Offering Materials;

      (c)     Whether the price of HCA's stock was artificially inflated; and

(d)     The extent of damage sustained by Class members and the appropriate measure of damages.

87.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

88.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

89.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FIRST CLAIM**
**Violation of Section 11 of**
**The Securities Act Against All Defendants**

90.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

91.    This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's stock pursuant to or traceable to the materially misleading Offering Materials issued in connection with the Company's March 9, 2011 IPO.

92.    This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Materials and within three years of the effective date of the Offering Materials.

93.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages from the defendants and each of them, jointly and severally.

## SECOND CLAIM
### Violation of Section 12(a)(2) of
### The Securities Act Against The Company and The Underwriter Defendants

94.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

95.     Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Offering Materials.

96.     This action is brought within three years from the time that the common stock upon which this Count is brought were sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

## THIRD CLAIM
### Violation of Section 15 of The Securities Act
### Against the Individual Defendants

97.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

98.     The Individual Defendants, by virtue of their positions and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of HCA within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause HCA to engage in the acts described herein.

99.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 16, 2011

Respectfully submitted,

**BRAMLETT LAW OFFICES
BY:**


/s/*Paul Kent Bramlett*_____
Paul Kent Bramlett TN#7387/MS #4291
Robert Preston Bramlett TN #25895

**BRAMLETT LAW OFFICES**
2400 Crestmoor Road
P. O. Box 150734
Nashville, TN 37215-0734
Telephone:    615.248.2828
Facsimile:    866.816.4116
E-mails:    PKNASHLAW@aol.com
            Robert@BramlettLawOffices.com

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
D. Seamus Kaskela
skaskela@ktmc.com
David M. Promisloff
dpromisloff@ktmc.com
Adrienne O. Bell
abell@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

*Attorneys for Plaintiff*